James G. CRICK, Petitioner-Appellee,

v.

Steve SMITH, Warden, Kentucky State Reformatory, Respondent-Appellant.

No. 80-3091.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 16, 1980.

Decided June 12, 1981.

Rehearing Denied Sept. 10, 1981.

Steven L. Beshear, Atty. Gen. of Ky., Robert L. Chenoweth, Michael R. Beiting, Asst. Attys. Gen., Frankfort, Ky., for respondent-appellee.

William M. Radigan, Asst. Public Defender, Frankfort, Ky., for petitioner-appellee.

Before ENGEL and BROWN, Circuit Judges, and GUY, District Judge.*

ENGEL, Circuit Judge.

James G. Crick entered counseled pleas of guilty in the Christian Circuit Court, Kentucky, to charges of murder, armed robbery, and taking a vehicle without the consent of the owner. After exhausting his state remedies, he sought freedom through federal habeas corpus proceedings in the United States District Court.

The events which led to the criminal proceedings occurred on November 29, 1973, seventeen days before Crick's eighteenth birthday. Under Kentucky law he was entitled as a minor to the protection of the state's juvenile statutes. Ky.Rev.Stat. § 208.010, *et seq.* At the time of the events here, sections 208.020 and 208.170 required that before a minor could be charged and tried in circuit court as an adult, the Juve-

---

* The Honorable Ralph B. Guy, Jr., District Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

nile Division of the District Court must have transferred jurisdiction over the case to the Circuit Court. Such transfer might be made only after a hearing and a determination that "the best interests of the child and of the public require that the child be tried and disposed of under the regular law governing crimes...." Ky.Rev.Stat. § 208.170.

The failure of his transfer order to make the foregoing specific finding concerning "best interests," and to state the reasons for the findings, Crick claims, violated his right to due process as defined in *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). The district court agreed and ordered issuance of the writ, finding also that Crick's state procedural default in failing to interpose an earlier objection to the order did not bar federal habeas corpus review. In this respect, the district judge held that the standard applicable to such defaults was the "deliberate by-pass" rule of *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), rather than the "cause" and "prejudice" rule of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977):

> In the case before us, the respondent argues that the "cause" and "prejudice" showing of *Wainwright* should be required. However, the Court believes that the proper standard by which to test the state procedural default in this case is that of "deliberate by pass", announced in *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). The Court's reading of both cases convinces us that *Fay* was only partially superseded by *Wainwright*. Where the procedural default involves a decision of counsel, such as failure to object, the threshold showing of "cause" and "prejudice" is required by *Wainwright*. That decision was based heavily on a desire to prevent "sandbagging" by counsel. However, where the procedural default involves a decision of

the defendant, such as failure to appeal, the proper question must be whether there was a "deliberate by pass" under *Fay*. We are supported in this conclusion by the concurring opinion of Justice Burger in *Wainwright v. Sykes, supra*, 433 U.S. at 91, 97 S.Ct. 2509.

We reverse and remand. In so doing we recognize that the juvenile court transfer order was technically defective, and hence violative of the due process required by *Kent*. We hold, for the purposes of this appeal at least, that the trial judge was correct in his holding that the deliberate by-pass rule of *Fay v. Noia, supra*, applies to consideration of the procedural default here. We depart, however, from the analysis of the district court as to the nature and timing of that procedural default. We hold that the harmless error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), can be applied in the context of the constitutional error involved in this case. We recognize the power of appellate courts to make such findings where appropriate, but exercise our discretion to remand to the district court for the purpose of making this determination.

I.

Kentucky does not seriously contest the petitioner's claim, if it is properly reviewable in federal habeas corpus proceedings, that the failure of the transfer order to include the specific findings, and the reasons for the findings, required by Kentucky law was a due process violation within the meaning of *Kent*. Extensive litigation both in Kentucky courts and in federal courts has centered on the common error which occurred here.[1]

In *Kent v. United States, supra*, the Supreme Court held that a minor is entitled as a matter of constitutional due process to compliance with the state's statutory protections provided for minors as a condition

---

1. *See White v. Sowders*, 644 F.2d 1177 (6th Cir. 1980); *Canary v. Bland*, 583 F.2d 887 (6th Cir. 1978); *Richardson v. Commonwealth*, 550 S.W.2d 538 (Ky.1977); *Bingham v. Commonwealth*, 550 S.W.2d 535 (Ky.1977); *Ris-*

*ner v. Commonwealth*, 508 S.W.2d 775 (Ky. 1974); *Whitaker v. Commonwealth*, 479 S.W.2d 592 (Ky.1972); *Smith v. Commonwealth*, 412 S.W.2d 256 (Ky.1967).

to their waiver to stand trial as an adult. In *Kent*, the Court determined that the applicable law of the District of Columbia granted the minor the rights to counsel, a hearing, a full investigation, and statement of reasons for the transfer. The due process violation in *Kent* was found to be the failure of the juvenile court to hold a hearing as well as make the requisite statement of reasons for the transfer. Nevertheless, since the petitioner had by then attained the age of majority, the Supreme Court did not direct that the writ issue outright. Instead it remanded the case to the district court to determine, after a hearing *de novo*, whether the waiver was appropriate under the particular facts of the case. *Kent, supra*, 383 U.S. at 565, 86 S.Ct. at 1059.

We are bound at the outset to observe that here, unlike *Kent*, the petitioner appears to have been accorded a full hearing in the juvenile court, at which he was provided counsel. No challenge to the completeness, fairness, or procedural regularity of that hearing is made. The sole flaw, it appears, came after the hearing when the juvenile court judge failed to incorporate the specific finding of "best interests of the child and of the public," and the reasons therefor, formally in the transfer order or elsewhere in the record. This distinction from the facts in *Kent* is important, not because it removes the constitutional flaw altogether, but because it demonstrates that much of the potential for injury present in *Kent* is not present here.

We conclude, therefore, that if the district court properly reached the issue, it also properly found that at least a technical violation of due process occurred when the juvenile judge failed to incorporate the necessary specific findings and reasons in the transfer order or record. The State of Kentucky, however, maintains that the petitioner's procedural default precluded the Kentucky appellate courts and us from reaching the issue in the absence of an affirmative showing by Crick that his failure earlier to raise the issue was excused by an adequate showing of "cause" and "prejudice" called for in *Wainwright*.

## II.

Much of the argument of the parties centers on the nature and timing of the procedural default, issues the parties urge must be resolved before determining whether *Wainwright* or *Fay* applies. We believe the disagreement arises from a confusion in concepts between the failure to exhaust state remedies as a statutory requirement for federal habeas corpus review under 28 U.S.C. § 2254(b) (1976), and the petitioner's original failure to observe state laws requiring him to make a timely objection, which may provide an adequate and independent state ground for the conviction.

Crick asserts that his failure to raise the *Kent* issue in his first, uncounseled RCr 11.42 motion is the relevant default for analysis here. Rule 11.42 provides for motions to vacate, set aside, or correct sentences subject to collateral attack on due process grounds.[2] Rule 11.42 requires, how-

2. Kentucky RCr 11.42 reads in pertinent part:
   Rule 11.42 Motion to vacate, set aside or correct sentence
   (1) A prisoner in custody under sentence who claims a right to be released on the ground that the sentence is subject to collateral attack may at any time proceed directly by motion in the court which imposed the sentence to vacate, set aside or correct it.
   (2) The motion shall be signed and verified by the movant and shall state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies in support of such grounds. Failure to comply with this section shall warrant a summary dismissal of the motion.

(3) The motion shall state all grounds for holding the sentence invalid of which the movant has knowledge. Final disposition of the motion shall conclude all issues that could reasonably have been presented in the same proceeding.

\* \* \* \* \* \*

(5) Affirmative allegations contained in the answer shall be treated as controverted or avoided of record. If the answer raises a material issue of fact that cannot be determined on the face of the record the court shall grant a prompt hearing and, if the movant is without counsel of record and is financially unable to employ counsel, shall appoint counsel to represent him in the proceeding, including appeal.

ever, that all grounds for holding the sentence invalid of which the movant has knowledge must be included in the first such motion.[3] RCr 11.42(3). The State of Kentucky, on the other hand, argues that the default first occurred upon Crick's counsel's failure to object to the transfer order at the time of the transfer hearing in the juvenile court. We disagree with both parties' analyses.[4]

■ We believe that, subject to the state's interpretation of the scope of its own provisions for collateral relief generally, a proper analysis of whether a procedural default is to be evaluated under *Wainwright* or *Fay* must begin with an inquiry into the circumstances under which the error first occurred. There should follow an analysis of the remedies then available to competent counsel under Kentucky law, a determination whether those remedies were pursued in timely fashion so that the error could be called to the attention of the appropriate Kentucky court at the earliest practicable opportunity and finally a decision whether the failure to pursue the correction of the error barred, under Kentucky law, the subsequent consideration of the issue, thus potentially providing an adequate and independent state ground for Crick's conviction. Only then can we decide which standard applies in determining the reach of federal habeas corpus review.

■ If an error occurred during the juvenile court hearing, as the State argues, a contemporaneous objection by counsel would have cured it. The error here occurred after the hearing, however, when the juvenile judge failed to incorporate specific findings of "best interest," and a statement of the reasons for the findings, in the order of transfer or the record. Since we know of no Kentucky procedure whereby Crick's counsel could have interposed an objection to the order in the juvenile court at this time, no procedural default could have occurred by his failure to do so.

Competent counsel could most likely have discovered the error shortly after the order was issued, when he received a copy or when he examined the proceedings for regularity before counseling his client whether to plead guilty or stand trial in circuit court. We do not know here whether counsel was aware of *Kent* at the time, but assume that, in the absence of exceptional circumstances, competent defense counsel should have been.[5] It seems almost certain that if Crick's counsel was competent and if he conceived that timely correction of the error might result in a remand and reassertion of jurisdiction by the juvenile court, he would promptly have acted in a number of ways to achieve that result. This might

---

(6) At the conclusion of the hearing or hearings the court shall make findings determinative of the material issues of fact and enter a final order accordingly. If it appears that the movant is entitled to relief, the court shall vacate the judgment and discharge, resentence, or grant him a new trial, or correct the sentence as may be appropriate.

An RCr 11.42 motion only may be invoked to review a denial of due process involving:

1. a violation of a constitutional right,
2. a lack of jurisdiction, or
3. such violation of a statute as to make the judgment void and therefore subject to collateral attack.

*Warner v. Commonwealth*, 385 S.W.2d 62 (Ky. 1964); *Tipton v. Commonwealth*, 376 S.W.2d 290 (Ky.1963).

3. *See Crick v. Commonwealth*, 550 S.W.2d 534 (Ky.1977), wherein the Kentucky Supreme Court held that Crick was barred from raising the *Kent* issue in a second RCr 11.42 motion, since he failed to raise that issue in his first

such motion. In *White v. Sowders*, 644 F.2d 1177 (6th Cir. 1980) (No. 79–3242), however, we held that where the *Kent* issue was raised *sua sponte* by the circuit judge during the petitioner's first, uncounseled RCr 11.42 motion, there was no procedural default barring federal review of the constitutional claim in the habeas corpus proceeding.

4. Because we disagree with both parties analyses of this issue, we need not address Crick's claim that the State of Kentucky did not dispute this matter in the district court.

5. Since *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), was decided in 1966, and the proceedings involved here took place in late 1973 and early 1974, we are not faced with a situation like that in *Smith v. Commonwealth*, 412 S.W.2d 256 (Ky.1967), in which the transfer order was filed before the decision in *Kent*.

have been accomplished informally by bringing the flaw to the attention of the prosecutor and the circuit judge, who presumably would have an equal interest in not running afoul of federal constitutional law. Kentucky law suggests that upon transfer to the circuit court, Crick's attorney could also have filed a motion to remand.[6] If the indictment had by then been returned, counsel could have filed a motion to recall the indictment and remand to the juvenile court for consideration of the "best interests of the child and of the public." Crick's attorney might also have availed himself of the procedures for appeal under Ky.Rev.Stat. § 208.380. In this respect, the Court of Appeals of Kentucky has recently held that the failure to appeal a juvenile transfer order to the circuit court precluded further review of the *Kent* issue in the Kentucky courts. *See Newsome v. Commonwealth*, (Ky.App.1980) (No. CA–1900–MR), *aff'd*, 609 S.W.2d 370 (Ky.1980) (No. 79–SG–422–DG). While *Newsome* came six years after Crick's transfer order, Ky.Rev. Stat. § 208.380 has been worded substantially the same way since at least 1972.

Competent counsel would have pursued correction in the circuit court, however, only if doing so offered any reasonable chance of getting a remand and reassertion of jurisdiction by the juvenile court, thus avoiding his client's charge, conviction, and

sentence on an adult crime. He would not necessarily have done so if convinced that any objection to the transfer order would only result in the timely correction of the transfer order and an even more unassailable plea, conviction, and sentence.

Regardless of whether the above procedures were employed, competent counsel anxious to obtain *Kent's* benefits and otherwise unsuccessful would at least have sought to appeal the conviction.[7] But Crick's counsel did not do so.

The procedural default that we must evaluate here is not Crick's failure to raise the *Kent* issue in his first RCr 11.42 motion, as he contends. Kentucky allows an RCr 11.42 motion to reach the *Kent* issue, at least where an appeal from the conviction has not been taken, only in special circumstances. *Smith v. Commonwealth*, 412 S.W.2d 256 (Ky.1967). *See also Holt v. Commonwealth*, 525 S.W.2d 660 (Ky.1975). In *Smith*, the defendant's counsel could not have known of the nature of the constitutional violation before the time for a direct appeal expired, since *Kent v. United States, supra*, was not decided until sometime thereafter. These special circumstances, wherein Kentucky allows a collateral attack on the conviction in spite of a failure to appeal, are not present in this case.

---

**6.** At the time of the transfer order here, Ky. Rev.Stat. § 208.170(2) provided for a remand of a juvenile felony charge from the circuit court to the juvenile court in a proper case:

(2) When juvenile court so transfers a case to the circuit court:

(a) If a grand jury considers the case and is satisfied there is sufficient evidence to indict the child, it may either return an indictment or may return a written report to the circuit court recommending that the child be committed to the department. If the court believes that such commitment would be proper, it may order the child committed to the department.

(b) If, during any stage of the trial in the circuit court, the child, or his parent or guardian so requests the judge in his discretion may stop the trial and commit the child to the department.

(c) If neither of the procedures specified in paragraphs (a) and (b) of this subsection are

employed, the child shall be tried as any other defendant.

(d) While under the jurisdiction of the circuit court, the child shall be subject to bail the same as an adult.

(e) Any commitment to the department under paragraph (a) or (b) of this subsection, shall be for an indeterminate period not to exceed the age of twenty-one.

**7.** *Bingham v. Commonwealth*, 550 S.W.2d 535 (Ky.1977), appears to recognize the existence of a right of appeal from a guilty plea in this particular type of case involving a challenge to the validity of juvenile transfer orders. *See also Canary v. Bland*, 583 F.2d 887, 889, 890 (6th Cir. 1978). A long list of cases up to at least *Davis v. Commonwealth*, 471 S.W.2d 740 (Ky.1971), however, has held that a guilty plea waives all defenses other than that the indictment charges no offense. Kentucky law, then, appears to have undergone some change on this point between *Davis* and *Bingham*.

■ We conclude, therefore, that the default under Kentucky law which would ordinarily bar Kentucky courts from further review of the issues not timely raised, and which therefore should be evaluated under either *Wainwright* or *Fay*, was the failure to appeal either the transfer of jurisdiction to the circuit court, or the judgment of conviction entered upon Crick's guilty plea. We so hold because this default most clearly focuses upon the primary cause of the loss of the right under state law.

■ To analyze the issue in terms of the exhaustion of state collateral remedies, and thus to tie it to the same rule which applies in determining whether to refrain from reaching the issue in section 2254 proceedings is simply not satisfactory, either to federal or state courts. State court employment of collateral remedies to reach federal constitutional issues is a practice to be encouraged. It hastens the time of their resolution and relieves the federal courts from the need to intervene. To hold that the state's collateral remedies open the door to consideration in federal habeas corpus proceedings of issues which the state holds as foreclosed on direct review discourages the states from expanding their use.

### III.

■ Exactly what remains of the deliberate by-pass rule of *Fay v. Noia, supra*, after *Wainwright v. Sykes, supra*, appears deliberately to have been left uncertain in *Wainwright*, as indeed is any precise definition of what constitutes "cause" and "preju-

dice." While *Wainwright* attacked the overly broad language of *Fay, Wainwright v. Sykes*, 433 U.S. at 87–88, 97 S.Ct. at 2506–07, its own language also speaks broadly concerning the underlying values of the two rules. Indeed, Justice Rehnquist's rationale for application of the "cause" and "prejudice" rule appears to apply as well to failures to appeal altogether as to other types of defaults.[8]

Chief Justice Burger's concurring opinion in *Wainwright*, however, suggests a distinction between *Fay* and *Wainwright* by noting that while the failure to interpose a contemporary objection in the course of the trial is the result of a decision normally left to the discretion of the attorney as manager of his client's case on trial, a decision on whether to appeal from the conviction is one made only upon consultation with, and with the consent of the defendant. 433 U.S. at 91, 92–94, 97 S.Ct. at 2508, 2509–10 (Burger, Ch. J., concurring). Because this is at least a rational distinction, and because *Wainwright* could have but did not explicitly overrule *Fay v. Noia, supra*, we conclude that the deliberate by-pass rule is still alive and well, or at least remains applicable to its own facts. Therefore, since we have held that the procedural bar here is the failure to appeal, we are led to agree with the district judge that normally it would be incumbent upon the state to demonstrate that such failure to appeal was the result of a "deliberate by-pass" of the right, or, in *Fay's* words, the " 'intentional relinquishment or abandonment of a known right or

---

**8.** Justice Rehnquist set forth five reasons for rejecting the "deliberate by-pass" rule of *Fay*:
(1) A contemporaneous objection requirement allows the record of the constitutional claim to be made when the recollections of the witnesses are freshest, rather than years later in a federal habeas corpus proceeding. (2) It allows the judge who observed the demeanor of the relevant witnesses to make the factual determinations necessary for deciding the federal constitutional question. (3) Contemporaneous objections give the trial court an opportunity to cure the claimed error, thereby making a major contribution to the finality of criminal litigation. (4) Compliance with a contemporaneous objection

rule may cause the prosecution to reassess its request for the admission of evidence when confronted with claims which would indicate the possibility of reversal by the state appellate courts or upon federal habeas corpus review. (5) The rule in *Fay v. Noia* could encourage "sandbagging" on the part of defense lawyers who wish to take their chances on the verdict of the initial jury, intending to raise their constitutional claims and obtain a new trial through federal habeas corpus proceedings if the initial verdict is unfavorable. *Wainwright, supra*, 433 U.S. at 88–89, 97 S.Ct. at 2507.
*Hockenbury v. Sowders*, 620 F.2d 111, 112–13 (6th Cir. 1980).

privilege.' " [9]  372 U.S. at 439, 83 S.Ct. at 849 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1937)).

## IV.

There yet remains, however, one consideration which inevitably arises from the foregoing analysis. If no competent attorney would conclude that efforts to correct the technical flaw in the transfer order could possibly have resulted in the reassertion of jurisdiction by the juvenile court, is not the constitutional error harmless in fact? If so, can a violation of due process under *Kent* ever be held harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in a federal habeas corpus proceeding? We conclude that it surely may. Such errors have historically been subject to the rule of harmless error, and they are within the intent of *Chapman.* That the Supreme Court in *Kent* believed such flaws were subject to the rule of harmless error is evident since it did not compel automatic issuance of the writ.

*Kent* itself presented even a more grievous deprivation of due process for it involved not only a failure to make specific findings in accordance with District of Columbia law but also a failure to accord a hearing altogether. Crick, however, received a full evidentiary hearing. Yet in *Kent,* Justice Fortas held that the remedy upon finding the due process deprivation was not an immediate release under the writ, but a remand to the district court for a *de novo* hearing to determine whether the waiver of jurisdiction from the juvenile court to the district court was "appropriate." *Kent,* therefore, contemplated that the conviction should be vacated only if the waiver were deemed inappropriate. It thus appears to have been the view of the Supreme Court that the right to due process, where its denial was the lack of a hearing and determination of appropriateness of the transfer order, did not necessarily require a grant of freedom outright, but a grant, tardily, of a hearing which had been denied. Under *Kent,* therefore, the prisoner should be discharged only if it should be determined that the failure to accord the right found violated resulted in actual prejudice.

It is not only *Kent's* own self-imposed limitations which persuade us that the *Chapman* rule of harmless error may be applicable, but other factors in the case as well. Foremost is the fact that Crick had court appointed counsel representing him both in the juvenile court, and upon transfer to the Christian Circuit Court, in the entry of his plea of guilty. It does not appear, therefore, that Crick was prejudiced by an inability to marshal the facts which should have been presented, or in arguing the merits of retention of jurisdiction, to the judge in the transfer hearing. Equally important is the fact that the error, though a constitutional violation, is not one which places into question the reliability of the finding of guilt which underlies the conviction. In this respect, we have a double guarantee of the reliability of Crick's guilt. First, while only a finding of "reasonable cause" was usually sufficient to most determinations in transfer proceedings at the time, Ky.Rev.Stat. § 208.170(1), here the juvenile judge specifically made his determination of Crick's involvement "beyond a reasonable doubt," and did so only after a full evidentiary hearing at which Crick was present and represented by counsel. Second, we have the fact of Crick's own counseled plea of guilty, which was upheld upon later collateral attack on the voluntariness and intelligence of it.[10] If, therefore, the harmless error rule of *Chapman* is limit-

---

**9.** Since we so hold, we need not address the difficult question of whether a different standard in considering a post-judgment collateral attack applies where the defendant acts *pro se.*

**10.** On March 15, 1974, less than two months after judgment of conviction was entered in Christian Circuit Court, Crick filed his first motion to vacate his sentence under Kentucky RCr 11.42. Crick was acting *pro se* in filing this motion and in it he attacked the voluntariness and intelligence of his plea of guilty. This motion was summarily overruled by the Christian Circuit Court on October 10, 1974. No appeal from this order was taken.

ed, and inapplicable to errors which affect the reliability of the truth finding process, that limitation clearly does not apply here.[11] We conclude, therefore, that the harmless error rule may in appropriate cases be applied where the constitutional error is one within the purview of *Kent v. United States, supra.* We next proceed to an examination of the facts of this case in the light of the harmless error rule of *Chapman.*

## V.

■ The record before us most strongly suggests that the transferring judge would not have revoked the transfer order and reasserted jurisdiction over Crick had he been made aware of the omission in the transfer order. Most likely, he merely would have incorporated the necessary findings, and reasons therefor, into the order or record. For this reason, we doubt the error could be considered as anything other than harmless beyond a reasonable doubt. The facts supporting these conclusions are:

1. The error here appears to have been one of omission of language in the order rather than any failure of the juvenile judge to understand the provisions of the statute. It goes against logic to believe that the juvenile judge did not understand that he had the power to retain jurisdiction.

2. James Crick, at the time he committed the murder, was within seventeen days of attaining adult status under the statute. Thus any treatment, incarceration, and rehabilitation would occur when he had under Kentucky law come of age.

3. The nature of the crime itself was grave, both in its consequences and in the penalty which ordinarily attached to it.

4. The facts of the crime show great brutality. The killing of John Thomas Master was the culmination of a day-long beer drinking spree on the part of Crick and his girlfriend's brother, Kenneth Ray Knight. Crick and Knight left a bar in Madisonville, Kentucky, the afternoon of November 29, 1973, and were headed out of town when they ran out of gas. Failing to get their car started, the two decided to hitchhike back to the parkway to obtain another car. They were picked up by the decedent, Master, about 4:30 or 5:00 p. m. Once in the car, Kenny Knight held a nail file to Master's throat and ordered him to stop the car. According to Crick, Master was about 5'8" tall, weighed about 145 pounds, had graying hair, and was partially bald. The idea to rob Master came from Knight. After Master stopped the car, Knight got the keys from him. Knight also took the victim's wallet and tossed it to Crick, who removed the money and threw the wallet away. Master, by then out of the car, attempted to escape by leaping over the guard rail. He tripped and fell, however, rolling to the bottom of the hill. Crick pursued him. From above, according to Crick, Knight was yelling "Kill him, Kill him, Kill him, Kill him." Crick said he was unable to do so, but admitted that he hit Master two or three times in the cheek and stomach. This apparently subdued Master, and Knight, before coming down the hill himself, suggested they take Master over a nearby fence and drown him in the stream which lay beyond. Knight then ordered the man to cross the fence and said he would shoot him if he did not. What followed is described in Crick's own words in his statement to the police:

Q. How did the man get in the water?

[Crick:] By himself, I mean he was kinda limping and all but he made it to the water and he got down on his knees, I mean when he got into the water he fell and then Kenny put his foot on the back

---

11. *See Berrier v. Egeler,* 583 F.2d 515 (6th Cir. 1978), in which the majority held that errors in the jury instructions went to the central issue of guilt or innocence and infected the fairness of the trial itself. For this reason, the error could not be deemed harmless beyond a reasonable doubt within the rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1969). 583 F.2d at 522. *But see* Comment, *Habeas Corpus: The Sixth Circuit Interprets the Cause and Prejudice Test of Wainwright v. Sykes,* 48 U.Cin.L.Rev. 862, 866–70 (1979).

of his neck and was holding him down and a few minutes later he let him up.

Q. Did he hold his head under the water?

[Crick:] Yes, so anyway he, the man wasn't dead when he brought him up so we drug him out of the water and put him on the bank and I hit him one more time and we turned around and left.

Q. After Kenny let him up from the water he was found up from the fence there. Did you drag him up on dry ground?

[Crick:] Yes, Sir.

Q. Tell how you drug him.

[Crick:] Both of us got him by one arm, I mean by both arms, and we drug him up the stream maybe 10 15 feet from the stream and laid him up on top of the bank.

Q. Was he bleeding at this time?

[Crick:] Yes, he was bleeding.

Q. Profusely, Quite a bit?

[Crick:] No, He was not.

Q. He was alive when you left?

[Crick:] Yes, he was, he was completely alive.

Q. Did he say anything?

[Crick:] No he did not, but he was alive, he was still breathing.

Master died of a brain concussion. Crick and Knight were eventually apprehended driving Master's car in Danville, Illinois, when they were arrested for speeding and drunk driving. While placing much of the blame on Knight and repeatedly saying the crime would not have occurred had he not been drinking, Crick has never since denied his own participation.

5. Extensive psychological reports prepared at the request of the juvenile court judge indicate that while slight of stature, Crick "gives the impression of being older" and "would give one the impression that he is far older than his seventeen years despite his slight build."

6. Crick's background history shows that he had attained a high degree of emancipation at the time of the crime. Prior to the crime, but in the same year, he had left his adopted home and gone to Chicago to live with an aunt and to seek employment. The record suggests he had an active adult sex life, and was enamored of a married but estranged woman many years his senior whom he hoped, ultimately, to marry.

7. The psychological reports, based upon interviews with Crick, concluded that while he was not psychotic, he was nonetheless potentially dangerous. He entertained considerable hostility toward his adoptive mother and an outright hatred for his natural mother, whom he considered to have abandoned him when he was young. Crick stated to one psychologist that he would kill his natural mother if he found her.

The juvenile court judge appears to have had knowledge of all the foregoing information available to him. There is, therefore, no reason, other than the failure to include specific findings in the transfer order, to believe that he did not consider these facts in ordering the transfer. At least based upon the record before us, it would be our own conclusion that the chances that the juvenile court judge would have changed his mind upon being apprised of the omission in his transfer order were zero.

### VI.

■ We recognize that employment of the *Chapman* harmless error rule has never been confined to any particular court. We have no doubt that we possess the judicial power to exercise it at the appellate level and even *sua sponte* where the facts properly before us justify it.[12] We recognize, also,

---

12. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979); *Harryman v. Estelle*, 597 F.2d 927 (5th Cir. 1979); *United States ex rel. Joseph v. LaVallee*, 415 F.2d 150 (2d Cir. 1969), *cert. denied*, 397 U.S. 951, 90 S.Ct. 976, 25 L.Ed.2d 133 (1970).

that it is a power which is to be exercised with restraint. Harmless error cannot and ought not be employed as a result-oriented vehicle for avoiding the often unpleasant judicial role of enforcing constitutional rights in difficult and unappealing circumstances. We believe, also, that an appellate court has the discretion to refer the question to the trial court for determination in the first instance. That procedure appeals to our sense of fairness here.

The harmless error issue here, as we analyze it, is whether it can be found beyond a reasonable doubt that the juvenile judge in Kentucky, in 1973–74, having omitted the statutory findings of "best interest" in the transfer order would not, on being apprised of the omission, have changed his decision and reasserted juvenile court jurisdiction over the defendant under the circumstances which existed in this case.[13] While we recognize our power to make this decision ourselves in an appropriate case, we conclude that fairness is better served by a remand to the district judge for his own evaluation in the light of the observations in this opinion. The issue has not previously been raised, to our knowledge, nor have the law and facts been analyzed in the manner we have undertaken here. Fairness, then, would seem to require that counsel for both the state and the petitioner be given an opportunity to be heard on this issue. In addition, there is a great advantage in having the perspective of a district judge from the state in which the case arose, who would be more sensitive to both the nuances and realities of Kentucky law and practice in making this determination. We see this procedure as an additional protection against the unfair application of the harmless error rule.

Accordingly, we vacate the judgment of the district court and remand for further proceedings. We instruct the district judge first to consider the applicability of the harmless error rule as defined in *Chapman*

*v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). He is free to hear arguments from counsel with respect to its appropriateness under the facts here. If he deems the record inadequate, he may in his discretion (but we do not so require) call for additional state record or hold an evidentiary hearing. If upon consideration of the question, he finds the defective transfer order to have been harmless beyond a reasonable doubt, he may then dismiss the petition, unless, of course, there then remain other unresolved issues not earlier addressed.

Second, if the district judge concludes that he may not fairly apply the harmless error rule, he shall then proceed to consider the question of whether Crick's transfer was nevertheless appropriate under Kentucky law. In such case, he shall have the authority to hold a *de novo* evidentiary hearing to the extent the state record is deemed inadequate, as described in *Kent* and directed by our court in *White v. Sowders*, 644 F.2d 1177 (6th Cir. 1980) (No. 79–3242). If he finds that Crick's transfer was appropriate, the petition may be dismissed unless unresolved issues remain. If he should decide that Crick would not properly have been transferred to the circuit court and thus subject to indictment and conviction as an adult, then the writ may again issue.

Reversed and Remanded.

**13.** The State of Kentucky bears the burden of proving that the error here was harmless beyond a reasonable doubt. *See Chapman v.*     *California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).