**Earl Lewis STRICKLAND, Petitioner,**

v.

**Ronald C. MARSHALL, Respondent.**

**No. C–1–83–321.**

United States District Court,
S.D. Ohio, W.D.

April 11, 1986.

Earl Lewis Strickland, pro se.

Karen A. Kolmacic, Asst. Atty. Gen., Columbus, Ohio, for respondent.

### OPINION AND ORDER DISMISSING PETITION

TIMOTHY S. HOGAN, Senior District Judge:

This matter is before the Court on Earl L. Strickland's petition for writ of habeas corpus and memorandum in support (docs. 2 and 5), respondent's return of the writ (doc. 6), and Mr. Strickland's traverse to the return (doc. 8). The transcript of Mr. Strickland's state court trial is also a part of the record and file in this case (doc. 7).

Petitioner claims the writ should issue for the following reasons, and we quote him:

1. The guilty verdict is not supported by legally sufficient evidence and the prosecution did not prove the elements of murder beyond a reasonable doubt. The prosecution did not prove the element of purpose/intent as defined in the offense of murder; the prosecution did not attempt to rebut, in any manner, defense evidence in which demonstrated petitioner was too intoxicated and drugged to have formed the element of intent.

2. Petitioner was denied the effective assistance of counsel as required by the Sixth Amendment under the facts of this particular case. Defense counsel failed to motion the trial court, pretrial, to suppress statements by petitioner that was incompatible with the defense advanced at trial, and where the statements were inadmissible under constitutional law. Defense counsel failed to point out to the trial judge that the state had failed to rebut the affirmative expert evidence introduced by the defense, so the elements of murder could not be found as presented by the evidence in this case. And these two failures denied petitioner of a defense that was factually substantial in nature. Then, defense counsel failed to point out to the trial court that since he was a taker of the same drug—prescribed, as petitioner was taking, that the trial judge should disqualify himself on any finding of same relative to alcohol and the facts of this case.

Respondent counters that Mr. Strickland is not entitled to the relief requested, as both claims are without merit.

No evidentiary hearing is required in this case because petitioner has not alleged any facts outside the record which, if proved true, would entitle him to the relief sought. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The arguments made by petitioner are legal ones, and the facts necessary to resolve these issues appear in the files and records already before the Court. Further, as petitioner has elucidated his legal arguments quite clearly, the interests of justice do not require the Court to exercise its discretion to appoint counsel to assist petitioner. *See,* 18 U.S.C. § 3006A(g); Rule 8(c), 28 U.S.C. fol. § 2254, advisory committee note.

### Summary of Facts and Proceedings

Earl Strickland was indicted by the September 1978 term of the Montgomery County, Ohio grand jury on one count of murder following the stabbing death of Flora Jean Swindle, Mr. Strickland's former common-law wife, on August 25, 1978. Mr. Strickland pled not guilty to the charge and waived his right to a jury trial. Trial to the Court was held on January 22 and 23, 1979, and the trial court pronounced its guilty verdict on January 24. Following is a summary of the evidence on which the verdict was based.

Rosa McLemore, in whose home the victim was killed, testified that she had been with Ms. Swindle all day on August 25. Around 9:00 in the evening, Ms. McLemore went upstairs to bathe and dress, leaving Ms. Swindle sitting in the livingroom of the McLemore house. Ms. McLemore's son, Jessie, came into the house and upstairs to tell his mother that Ms. Swindle was still downstairs. Later, the son called up to his mother from outside the house to tell her that Earl Strickland was entering the house carrying a gun. Ms. McLemore called the operator to connect her with the police and informed the police that a man was killing a lady at her address. She heard no gunshots, however. Ms. Swindle called upstairs for Ms. McLemore to bring $200.00 downstairs, and Ms. McLemore replied that she had no money. She then heard the victim cry out the name "Earl, Earl." She also heard Earl's voice asking about his "damn money." Her son came upstairs again to tell her that "Earl done killed Jean." When Ms. McLemore came downstairs, she found the victim lying dead on her floor and her furniture spattered with blood. Later that evening, at the police station, Ms. McLemore heard Earl Strickland's voice in the room next to her: "He said that he killed the bitch and he would intend to kill her. If he hadn't, somebody else would." Ms. McLemore also testified that, a few weeks before the killing, Earl Strickland had come to her house and created such a disturbance that Flora Jean Swindle called the police, who came and took Mr. Strickland away. On cross examination, Ms. McLemore testified that Mr. Strickland had threatened to kill Ms. Swindle during the August 3d incident and that she smelled alcohol on him that day.

Jessie McLemore testified that when he left his mother's house after telling her that Ms. Swindle was sleeping downstairs, he went across the street to Bea's house and was standing on the sidewalk talking to Bea when he saw Earl Strickland going into his mother's house. Jessie went back across the street and looked in the window; he saw Mr. Strickland go to the chair in which the victim was sitting and hold a knife toward her head. Jessie heard Mr. Strickland say "I'll kill her, I'll kill you." He then went next door to tell the neighbor to call the police. He went back to the house, stood on the porch, and saw Mr. Strickland kneeling on the floor straddling the prone Ms. Swindle, stabbing her with a knife approximately eight inches long. Jessie ran next door again to tell the neighbor to call the police again, and as he was coming out of the neighbor's house, he saw Mr. Strickland pass by, going down the street with the knife in his hand. Mr. Strickland was walking straight, leaning a little. Jessie went back in the house and saw the victim lying dead on the floor with

blood all around. He, too, was taken to the police station later that evening, where he overheard Mr. Strickland say he meant to kill the victim. On cross examination, Jessie indicated that he thought the lean to Mr. Strickland's walk indicated that the latter had had something to drink but that "[h]e wasn't that ... He ain't had that many drinks." Jessie also testified that there were perhaps a dozen people in front of his house that evening when Earl Strickland arrived, because the ice cream truck was on the street.

A neighbor named Kim Caldwell testified that when she heard that something was going on inside Rosa McLemore's house the evening of August 25th, she stood on the front porch and looked in the front door to see Earl Strickland stabbing Flora Jean Swindle. She ran after seeing him stab the victim once and saw Mr. Strickland leave the house carrying a knife: "He was just walking normal, you know. The knife was down by his side. He was just walking." Later that evening, at the police station, she heard Mr. Strickland say that if he didn't get her, somebody else would.

The final eyewitness, Annette Henderson, had parked her car in the neighborhood and was walking to pick up her babysitter when Earl Strickland approached and asked if he could come with her. Mr. Strickland appeared normal to the witness, and did not appear to be drunk. He walked away down the street. Ms. Henderson saw Mr. Strickland again, about ten minutes later, on the sidewalk in front of Bea's house. He came up and asked where Jean was. Then he went across the street and into Rosa McLemore's house. Mrs. Henderson went across the street and up onto the porch. When she looked inside she saw the knife go up and down, up and down, and then when the man got up, she ran back across the street. Mr. Strickland left the house and walked down the street with the knife in his right hand. She saw nothing unusual about Mr. Strickland's walk. At the police station, she overheard Mr. Strickland: "He said that he is glad that bitch is dead and that if he didn't kill her somebody else would."

The remainder of the prosecution's witnesses were police officers and the coroner. First to testify was Officer Thomas Bennett who identified pictures of the victim and the McLemore house and who interviewed witnesses and took them to the station. He testified that the room in which the stabbing took place was "pretty well messed up, almost like a fight had occurred in there."

John Weeks was the officer who apprehended Mr. Strickland following the stabbing of Flora Jean Swindle. He saw Mr. Strickland walking along the street at a slow, deliberate pace, carrying nothing, but wearing trousers with a large red stain on the front. Officer Weeks told Mr. Strickland why he was being arrested, patted him down, handcuffed him, placed him into the patrol car, and read him his rights. Upon being read his rights, Mr. Strickland stated that he did not want to hear them because he already knew them. The officer observed a cut on Mr. Strickland's right thumb. Once inside the patrol car, it was "quite apparent" to the officer that Mr. Strickland smelled of alcohol.

Officer George Hammann was the officer who had arrested Mr. Strickland on August 3 at Rosa McLemore's house. In his cruiser, the officer reported Mr. Strickland said "you're lucky that you arrested me at this time. He said, I'm going to kill her." On cross examination, the officer testified that Mr. Strickland was not "totally intoxicated" on August 3, although he had an odor of alcohol on his breath and was in a very angry mood.

Officer Ronald Brandenburg was assigned to the evidence crew on August 25, 1978. He identified pictures of the house and the victim. He had taken a U.S. Navy knife holder, a man's hat, a man's glasses, and a pair of scissors into custody at the scene of the stabbing, and he identified those items at trial. He also identified the shirt, pants and hat that were taken from Mr. Strickland that evening. He admitted on cross examination that he had not dusted the knife holder for fingerprints.

Criminalist Gary Koverman testified that he examined for the presence of blood a pair of glasses, a pair of trousers, underwear, a hat, a knife holder, a black shirt, and a pair of scissors. All items were found to have blood except the scissors. The blood was type O, which was the blood type of both Flora Jean Swindle and Earl Lewis Strickland; there was not sufficient blood on the shirt for typing.

Dr. James Mullaney, chief pathologist in the coroner's office, conducted an autopsy on the body of Flora Jean Swindle and determined that her death was caused by multiple stab wounds to the chest—seven in the back and two in the front. The body also showed defense wounds to the right and left hand and left arm and one stab wound in the forehead, for a total of fourteen wounds.

The prosecution moved the admission of its exhibits and rested its case. Defense counsel then made a motion for judgment of acquittal on the purposeful murder charge, on the ground that the state had not offered evidence of Mr. Strickland's purpose. The trial court overruled the motion.

Over prosecution objections, Detective Frederick England testified that he interviewed Earl Strickland the day after the stabbing. The story related to the detective by Mr. Strickland was that Flora Jean had called him to come over to Rosa's house, but that when he arrived, Flora Jean had a knife. She stuck the knife at him a few times, then he took the knife from her, stuck her a couple of times, left the knife and walked home. Quoting from his report, the detective said Mr. Strickland stated: "I got so mad last night I said fuck it. I don't care if I have to go back to the penitentiary. I can't take her any more." The detective had not asked Mr. Strickland if he had been drinking, nor did Mr. Strickland claim that he had suffered a blackout, or that he did not know what he was doing when he stabbed the victim, or that he could not recall the events of the previous evening.

Earl Strickland testified on his own behalf. His relationship with Flora Jean Swindle began in 1975; they had lived together and brought two children into the world. They never got along well and were always arguing. They were separated at the time of the stabbing and Mr. Strickland had another girl friend. That relationship created problems between Mr. Strickland and Ms. Swindle; on August 3, Mr. Strickland broke the news to Ms. Swindle that he loved his new girl friend, Geneva Guy, and that he would not be seeing Ms. Swindle anymore. She got angry and, when she got out of his car, kicked the car door and damaged it. Mr. Strickland and Ms. Swindle had always fought, and he was arrested twice on charges arising out of those fights; the charges were dismissed both times. Ms. Swindle had threatened Mr. Strickland with a knife a number of times.

On August 25, 1978, Mr. Strickland was on sick leave from his job because of a pulled back muscle for which he was taking a prescribed muscle relaxant, Flexeril. When he got up that morning, he took three pills with a pint of wine. Then he took Geneva Guy to work, returned home, and went back to sleep. He got up in the afternoon and got a second pint of wine and drank that with three more pills. When Geneva was finished work, around 6:30, he picked her up and the two of them went to a friend's to drink and play cards. Mr. Strickland drank three or four glasses of gin, each containing a double shot. Around 9:00, Mr. Strickland drove himself and Ms. Guy home. He laid down and the phone rang; it was Ms. Swindle telling him that she had the money to fix his car door and he should come to Rosa's house to get it. He got into his car and drove around the corner. He went up to the porch of Rosa McLemore's house, and the house was dark; he turned around to go back to his car, but Ms. Swindle opened the door and told him to come in. He asked about the money, and Ms. Swindle called up the steps to Rosa. Ms. Swindle came back and sat on the couch next to Mr. Strickland and asked him to make love to her one more

time before he left her for Ms. Guy. He refused. When he got up to leave, "she jumped up and said, if I can't have you, no other bitch is going to have you, and she reached at me. I turned around, and I caught her arm. She had a knife in it." They "tussled" over the knife and he got it from her: "I remember sticking her a couple times." Mr. Strickland remembered walking out the door then, and he vaguely remembered the police officers arresting him.

Mr. Strickland wasn't sure whether he had a knife with him when he left to go to Rosa's house that evening, but he was sure that it wasn't the knife that belonged in the knife holder found at Rosa's after Ms. Swindle's death, because, although that looked similar to a knife he owned, his had been missing since Flora Jean moved out of his house. Mr. Strickland testified that he was cut on his thumb and small finger while trying to get the knife from Ms. Swindle. He also remembered that, at the point when he had the knife in his hand, he was "[a]s angry as I have ever been in my life. I was mad. She had made a attempt on my life, and I had just taken the knife out of her hand, and I just started using the knife."

Geneva Guy testified to having seen Flora Jean Swindle with a knife twice. On the day of Ms. Swindle's death, Ms. Guy went to work and got off at 6:00. The first time she saw Mr. Strickland that day was at 7:30 in the evening, when he picked her up at her home and they went to a friend's house. Mr. Strickland was already intoxicated at 7:30. At the friend's house, Mr. Strickland had "three cups of gin" in the hour and one-half they were there. At 9:00, the two went back to Mr. Strickland's house and the phone rang. When Mr. Strickland answered the phone, Ms. Guy went to another extension, picked up the receiver, and listened to the conversation. Ms. Swindle asked Mr. Strickland to come pick up the $200 for his car. Mr. Strickland told Ms. Guy he was going out for a beer, and he left at 9:40 to walk to meet Flora Jean. Ms. Guy had seen Mr. Strickland intoxicated before, but not as intoxi-

cated as he was that night. He was gone for around fifteen minutes, then she saw him coming back. He was staggering and drunk and had blood on his clothes. She ran back into the house and went upstairs. She did not know where he went after that.

Dr. Gideon Adegbile was the family practitioner who prescribed the muscle relaxants for Earl Strickland. Dr. Adegbile testified in response to a hypothetical question that required him to assume that Mr. Strickland, in a twelve hour period on August 25, drank two pints of wine, six ounces of gin, and two Flexeril tablets, that "he will probably be acting not entirely under his own control and hence will unintentionally ... [c]ause the death of another person." On cross examination, presented with the testimony of other witnesses, that Mr. Strickland walked without staggering, later recalled the incident and stated he meant to kill her, the doctor admitted that one or the other—the drug or the alcohol—would not have been present, that the evidence would contradict his assumption about the quantity of alcohol or drugs consumed.

Detective Randy Brannon testified that he interviewed Mr. Strickland at 11:18 on the evening of August 25th. He asked Mr. Strickland about a breathalyzer, and he determined that Mr. Strickland had consumed some alcoholic beverages. The detective did not recall Mr. Strickland being loud or angry, but he could not rule out the possibility that other witnesses in the police station could have heard Mr. Strickland's voice. Mr. Strickland told the detective that Flora Jean had made statements that made him angry and then "the next thing he knows there was a knife in his hand, and then he went off." On cross, the detective recalled that Mr. Strickland had admitted drawing guns and knives in the victim's face before. The detective asked Mr. Strickland what he had to drink, and the reply was that he had only drunk beer, even though he didn't like beer. Mr. Strickland had not told the officer that Ms. Swindle called him; rather, he said he went

to find out why Rosa had had him locked up before.

The defense rested, and the prosecution offered no rebuttal witnesses. Defense counsel renewed his motion for judgment of acquittal because of the doctor's testimony regarding the element of intent. The motion was overruled. Following closing arguments, the trial court retired to its deliberations, returning a guilty verdict the following day. On February 2, 1979, Mr. Strickland was sentenced to serve from fifteen years to life.

Mr. Strickland was represented by substitute counsel in his direct appeal of this conviction. On appeal, Mr. Strickland claimed that he was so affected by his alcohol and drug consumption that he was unable to form the intent to kill Flora Jean Swindle. The appeals court reviewed the evidence that tended to disprove Mr. Strickland's claims of intoxication and to prove his extreme animosity towards the victim and found it sufficient to prove beyond a reasonable doubt that Mr. Strickland was able to form the necessary intent to kill. Finding no other errors in the record, the Court of Appeals of Montgomery County, Ohio affirmed the conviction on October 19, 1979. Mr. Strickland filed in the Court of Appeals a notice of appeal to the Ohio Supreme Court but did nothing further.

On August 11, 1980, Mr. Strickland filed a petition for post-conviction relief which was denied on November 25, 1981. On appeal from this denial, he made two assignments of error: 1) that the trial court erred in failing to suppress statements made by Mr. Strickland at the police station while he was intoxicated; and, 2) that he was denied the effective assistance of counsel by counsel's failure to investigate and assert substantial defenses. In its opinion, the appeals court refused to consider the first claim of error, because it had not been raised at trial or on direct appeal. On the second claim, the court found that the broad statements made by Mr. Strickland failed to show any violation of an essential duty, that there was no prejudice to Mr. Strickland in any event, and that Mr.

Strickland had had a fair trial. The dismissal of the post-conviction petition was affirmed on April 26, 1982. Mr. Strickland did not timely file a notice of appeal to the Ohio Supreme Court.

In his *pro se* memorandum in support of jurisdiction to the Supreme Court of Ohio, Mr. Strickland attempted to appeal both court of appeals decisions, raising two propositions of law: 1) the evidence was insufficient to prove beyond a reasonable doubt that Mr. Strickland could have formed the requisite intent to kill; and, 2) Mr. Strickland was denied his right to counsel by counsel's failure to object before trial to statements made by Mr. Strickland while he was intoxicated. On December 1, 1982, the Supreme Court summarily dismissed the appeal for lack of a constitutional question and denied leave to appeal.

Mr. Strickland then filed his petition seeking a writ of habeas corpus.

### Discussion

█ A state prisoner's application for a writ of habeas corpus will not be granted unless he has exhausted his available state remedies. 28 U.S.C. § 2254(b) and (c). This requirement has two component parts. Not only must there be no remaining state forum in which the petitioner can raise his claims, but also the petitioner must have given the state courts an opportunity to rule upon those claims.

█ Exhaustion of available state remedies has been accomplished in the instant case. Mr. Strickland took a direct appeal in which he raised the issue of his ability to form the intent to kill before both the intermediate appeals court and the state supreme court, albeit belatedly. The ineffective assistance of counsel issue was raised in a petition for post-conviction relief under Ohio Revised Code Section 2953.21. Res judicata would therefore bar either of these issues from being raised in a subsequent post-conviction petition. *See State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967) (issues raised on direct appeal cannot be raised again); *State v. Castro,* 67 Ohio App.2d 20, 425 N.E.2d 907 (1979) (issues

raised in post-conviction petition, the denial of which is not appealed, are *res judicata*). As Ohio recognizes no other means of collateral attack upon a conviction, Mr. Strickland has exhausted all available state remedies.

█ Despite this exhaustion of remedies, the Court may still be barred from considering any claim the substance of which has not been "fairly presented" to the state courts for resolution. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam). It is not necessary for any state court to have actually addressed the merits of the claims, so long as the claims have been presented to the highest court in the state. *Meeks v. Bergen*, 749 F.2d 322, 325 n. 1 (6th Cir. 1984). However, where the reason for the state court's failure to address the merits of a claim is some procedural default on petitioner's part, the federal court may not address that claim absent a showing of both cause for the default and actual prejudice from the constitutional violation claimed. *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The burden of proving cause and prejudice falls upon the petitioner. *Fornash v. Marshall*, 686 F.2d 1179, 1186–87 (6th Cir. 1982), *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983).

Both of Mr. Strickland's attempts to obtain Supreme Court review were marred by procedural defects. Mr. Strickland may therefore have waived his right to present his claims for relief to a federal court, although, as he was acting *pro se*, it is not clear whether he must meet the cause and prejudice standard of *Sykes*, or some lesser standard, to avoid such a waiver. The Supreme Court has recently declined to express its view on the applicability of the *Sykes* standard to a *pro se* petitioner's procedural default. *Reed v. Ross*, 468 U.S. 1, 104 S.Ct. 2901, 2908 n. 7, 82 L.Ed.2d 1 (1984). Unfortunately, the Court gave no clue as to the standard that should apply to such a petitioner. Prior to the *Sykes* decision, the standard for waiver was whether a "deliberate bypass" had occurred. *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Chief Justice Burger's concurring opinion in *Sykes* indicates that this standard has continuing applicability where the default is the result of a decision made by the defendant himself. 433 U.S. at 92, 97 S.Ct. at 2509; *accord, Crick v. Smith*, 650 F.2d 860, 863 (6th Cir.), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1281, 71 L.Ed.2d 464 (1981). Both Noia and Crick were represented by counsel, however, and such representation would appear necessary to application of a standard which only bars issues which were the subject of a knowing and deliberate bypass of a state procedural right or remedy. Were this the appropriate standard, all a *pro se* petitioner would have to say to avoid being held to have waived a claim would be: "I didn't know."

█ We are left, therefore, without a clearly enunciated standard to apply to determine whether Mr. Strickland may properly raise his claims in a federal habeas petition. A trend has been apparent, however, in that a petitioner will be found to have waived his right to present a claim much more readily under the more recent *Wainwright v. Sykes*, which places the burden of proving cause and prejudice upon the petitioner himself, than under *Fay v. Noia*, which placed the burden of proving petitioner's deliberate bypass of state procedures on the state. The Sixth Circuit, while acknowledging that what remains of the deliberate bypass rule is somewhat uncertain after *Sykes*, chose to apply *Sykes* to an issue that had not been raised on direct appeal, citing to *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982), for the proposition that *"any* prisoner bringing a constitutional claim to the federal courthouse after a state procedural default must demonstrate cause and actual prejudice before obtaining relief." *Payne v. Rees*, 738 F.2d 118, 124 (6th Cir.1984) (emphasis added). In light of the trend to narrow federal review of state convictions, the Sixth Circuit's preference for the *Sykes* cause and prejudice standard, and the clear inappro-

priateness of the *Noia* deliberate bypass standard to a *pro se* petitioner, we conclude that the former should apply. Thus, Mr. Strickland must bear the burden of proving cause for his procedural defaults and actual prejudice from the claimed violations.

While counsel's ineffectiveness in committing the default may satisfy the "cause" prong of the *Sykes* standard, *Alcorn v. Smith*, 781 F.2d 58, 60–61 (6th Cir.1986), we would hesitate to endorse a similar holding where the petitioner was his own counsel at the time of the default. Such a ruling would effectively reward the lazy petitioner and penalize the industrious petitioner who makes a good faith effort, albeit an imperfect one, to comply with the rules of pleading and procedure. It is well-settled, however, that a *pro se* petitioner's pleadings are to be given a liberal construction and held to less stringent standards than those drafted by lawyers. *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir.1985). We see no rational reason to accord different treatments to different procedural flaws. Therefore, if we may leniently view a *pro se* petitioner's efforts to comply with state rules of appellate procedure, his status must affect the definition of the "cause" prong of the *Sykes* standard. We do not adopt a blanket rule that would forgive all procedural defaults by *pro se* petitioners, nor do we express any opinion whether a petitioner who represented himself by choice at trial should be held to have waived issues not raised at the appropriate time during trial. We merely hold that a petitioner who is representing himself on appeal because he is no longer entitled to the assistance of counsel should not be held to a stringent definition of "cause."

■ The Supreme Court deliberately failed to give "precise content" to the cause and prejudice standard in *Sykes*. 433 U.S. at 87, 97 S.Ct. at 2506. For several reasons, we believe that our holding in this matter is in keeping with both the rule of *Sykes* and the rationale behind it. First, in *Sykes* the Court expressly left open the question whether habeas review of claims omitted "other than for reasons of tactical

advantage" should be precluded. *Id.* at 88 n. 12, 97 S.Ct. at 2507 n. 12. The Court was not then addressing an inadvertent error committed by a *pro se* petitioner, but a deliberate attempt by counsel to hold back a constitutional claim for later presentation to a federal court in an effort to obtain a second trial if the verdict in the first was unfavorable. Second, the default in *Sykes* took place at trial, which is significant both because Mr. Sykes was represented by counsel at the time of the default and because the error to which no objection was made could have been cured or avoided at trial, thus promoting the finality of the resulting judgment. The state's interest in conducting trials that are as error-free as possible is simply not implicated where the procedural default is something other than failure to observe a contemporaneous objection rule. The rule we propose and follow here is consistent, therefore, with *Sykes:* The "cause" prong of the *Sykes* standard is met where 1) a petitioner, who is acting *pro se*, 2) inadvertently and through excusable neglect violates a state rule of appellate procedure, and, 3) the state court relies on the procedural default to avoid addressing the merits of the claims, although 4) the claims raised in the habeas petition were presented to the state's highest court for resolution.

### 1. *Insufficient Evidence*

■ Applying the rule to the instant case, Mr. Strickland meets the cause standard with regard to the first of his claims for habeas relief, but does not with regard to the second. The claim of insufficient evidence to establish the necessary intent beyond a reasonable doubt was properly raised on direct appeal. The procedural default that apparently prevented the Ohio Supreme Court from addressing this issue was the failure to file a copy of the notice of appeal from the court of appeals decision with the Supreme Court, as required by Supreme Court Rule 1, Section 1(B). This default was argued in the state's memorandum in opposition to jurisdiction, so despite the Supreme Court's failure to specify the reasons for its refusal to hear

the appeal, we must assume that the procedural default constituted a substantial basis for the refusal. *Gilbert v. Parke,* 763 F.2d 821, 825 (6th Cir.1985). Nonetheless, Mr. Strickland's *pro se* memorandum in support of jurisdiction fairly presented the substance of this first claim to the state's highest court for resolution. His failure to comply with the Supreme Court rule cited above is excusable in light of the overall lack of clarity in the Ohio scheme: Although Ohio Revised Code Section 2505.04 states that an appeal is perfected when the written notice of appeal is filed with the lower court, the supreme court rule requires the filing of a copy with that body. However, the rule does not indicate *who* should file the copy with the state supreme court, merely that one must be filed; yet, in the state's rules of appellate procedure, it is clearly stated that the clerk of the trial court must forward a copy of the notice to the clerk of the court of appeals named in the notice. In light of the different procedures required at the two levels, Mr. Strickland's failure to file a copy of his notice of appeal with the Supreme Court of Ohio was an excusable and inadvertent violation of. the rule.*

▮▮▮▮ To determine whether Mr. Strickland can likewise meet the "prejudice" prong of the *Sykes* standard, we must assume that his constitutional claim is valid, then determine whether he was prejudiced by the error. *Maupin v. Smith,* 785 F.2d 135, 139 (6th Cir.1986). Where the claim is one of insufficient evidence to support the conviction, actual prejudice to the petitioner is "self-evident." *Id.* at 140. Having found both portions of the *Sykes* standard satisfied, we may now address the merits of Mr. Strickland's first claim for relief.

▮▮▮▮ The due process clause of the fourteenth amendment protects a criminal defendant from being convicted of a crime without proof beyond a reasonable doubt of every element of the offense. *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). In reviewing a state conviction to determine whether it can constitutionally be upheld, we must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). We must also draw "all reasonable inferences consistent with the verdict." *United States v. Orrico,* 599 F.2d 113, 117 (6th Cir.1979). Then, we must uphold the verdict if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis original); *accord, Brown v. Davis,* 752 F.2d 1142, 1144 (6th Cir.1985).

▮▮▮▮ Mr. Strickland claims that the testimony of his family practitioner established that he was too drugged and intoxicated to have formed the requisite intent to kill Flora Jean Swindle. Were this a case in which an expert opinion, based on actual knowledge of the criminal defendant's situation, went unrefuted, and was, in fact, supported by testimony of the prosecution's own witnesses, this Court would not hesitate to find that no rational trier of fact could have found beyond a reasonable doubt that Mr. Strickland intended to kill Ms. Swindle. *Cf. Duffy v. Foltz,* 772 F.2d 1271 (6th Cir.1985) (rape conviction could not stand in light of testimony from treating psychiatrist that defendant was temporarily insane and testimony from victim that defendant carried on a conversation with an absent third person). In the instant case, however, Mr. Strickland's physician testified in response to a hypothetical

---

* We have assumed for the purpose of this discussion that the failure to file was an error on Mr. Strickland's part rather than on the part of appointed counsel, as it is likely Mr. Strickland was no longer represented by counsel following his first appeal as of right. *See e.g., Ross v. Moffitt,* 417 U.S. 600, 614–16, 94 S.Ct. 2437, 2445–46, 41 L.Ed.2d 341 (1974). Were the error

counsel's, it would likely meet the *Beasley v. United States,* 491 F.2d 687 (6th Cir.1974) standard for ineffective assistance, which would likewise constitute "cause" to permit Mr. Strickland to raise the claim in his federal petition. *Alcorn,* 781 F.2d at 612; *Hollin v. Sowders,* 710 F.2d 264, 268–69 (6th Cir.1983) (Merritt, J., concurring).

question, the factual underpinnings of which were strongly refuted by eyewitness testimony. Even the doctor, when confronted with the testimony of the prosecution's witnesses, conceded that he would have to question the accuracy of the facts underlying the hypothetical. In short, the extent of Mr. Strickland's intoxication, and his concomitant ability to form the requisite intent, were the subject of a credibility determination. A careful review of all the testimony reveals ample basis for a rational trier of fact to find all the elements of the crime proven beyond a reasonable doubt. There was no violation of Mr. Strickland's due process rights and no basis for the issuance of the writ.

## 2. *Ineffective Assistance*

The issue of trial counsel's ineffectiveness could have been raised on direct appeal, because Mr. Strickland had new counsel for the latter proceeding. It was not raised however, until the petition for post-conviction relief, so the state courts could have relied on *res judicata* and declined to address the claim on its merits. *See, State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169 (1982). The state court of appeals did address this claim on the merits, so we would also be permitted to address it were it not for the second default—the failure to file a timely notice of appeal following the court of appeal's affirmance of the denial of the post-conviction petition. A post-conviction petition is a civil proceeding, so the petitioner has only thirty days to file his notice of appeal. *State v. Milanovich*, 42 Ohio St.2d 46, 49, 325 N.E.2d 540 (1975); *accord State v. Mapson*, 1 Ohio St.3d 217, 438 N.E.2d 910 (1982). Supreme Court Rule II, Section 8, which provides some discretion in a felony case in which the required notice was not timely filed, does not apply. *Cf. State v. Harvey*, 68 Ohio App.2d 170, 428 N.E.2d 437 (1980) (construing Rules of Appellate Procedure). The Supreme Court of Ohio was therefore without jurisdiction to hear the appeal from the affirmance of Mr. Strickland's post-conviction denial. Again, as this procedural flaw was argued by the state, we assume it was a substantial basis

for the denial of the motion for leave to file. *Gilbert*, 763 F.2d at 825.

■ We need not decide whether Mr. Strickland's failure to timely file this notice of appeal was inadvertent and excusable, as he failed to present the substance of his ineffective assistance of counsel claim to the Ohio Supreme Court for its resolution. Thus, even under our relatively lenient standard for a *pro se* petitioner's satisfaction of the cause prong of the *Sykes* standard, Mr. Strickland has waived his right to present this claim for habeas review. In his post-conviction petition, Mr. Strickland claimed his counsel was ineffective for failing to investigate and assert substantial defenses. The claim was soundly rejected as conclusory and unsupported by any factual allegations. In his memorandum in support of supreme court jurisdiction, Mr. Strickland abandoned the prior allegation and asserted instead counsel's failure to object pre-trial to the admission at trial of statements made by Mr. Strickland shortly after the incident and overheard by prosecution witnesses at the police station. In his present petition, Mr. Strickland re-asserts the failure to object to the admission of these statements and adds a few other alleged errors on the part of trial counsel. No state court was ever presented with all the claims and factual allegations now being pressed. Mr. Strickland failed to "fairly present" his claims, therefore, and cannot avail himself of our new "cause" standard which only forgives a *pro se* petitioner's excusable and inadvertent error that prevented otherwise well-presented claims from being considered by the state's highest court. The *Sykes* standard being conjunctive—cause *and* prejudice—we need not, therefore, discuss the claimed ineffective assistance of counsel to determine whether it caused actual prejudice to Mr. Strickland.

## ORDER

As there is no merit to the one ground properly presented to this Court, the petition is dismissed.